## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF **ADT, LLC ACCOUNT RECORDS ASSOCIATED WITH THE FOLLOWING ACCOUNT IDENTIFIERS:**<br><br>• **PHYSICAL ADDRESS: 6623 WOOD AVENUE, KANSAS CITY, KS 66102**<br>• **ACCOUNT HOLDER: ALICE TURNER**<br>• **BETWEEN FRIDAY, OCTOBER 14, 2022 AT 12:01 A.M. (CST) AND TUESDAY, OCTOBER 18, 2022 AT 11:59 P.M. (CST)** | Case No. **22-mj-8263-TJJ**<br><br>**Filed Under Seal** |

## APPLICATION AND AFFIDAVIT FOR SEARCH WARRANT

1. I, Ryan Fincher, a Task Force Officer (TFO) with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), being first duly sworn, hereby depose and state as follows:

2. I have been employed as a sworn law enforcement officer with the Kansas City, Kansas Police Department (KCKPD) since July 1997. I have held the rank of detective since January 2008. I am currently assigned to the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), Kansas City Division Group 1, as a Task Force Officer (TFO). I have received training in criminal investigations and my duties include the investigation of federal firearms violations. During my employment, I have participated in numerous investigations including, violent crimes including homicides, firearm violations, person and property crimes and fatality traffic accident investigations. Of these investigations, many have led to the prosecution of suspects. I have received training related to electronic data, and the

collection, recovery, and analysis of evidence. As a TFO with the ATF, I have executed federal search warrants and arrest warrants.

3. This application and affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## INFORMATION SOUGHT AND LEGAL BASES THEREFORE

4. This application seeks a search warrant for records held by ADT, LLC ("ADT"), a home security products company headquartered in Boca Raton, Florida, which accepts legal process in Kansas c/o CT Corporation System, 112 SW Seventh Street, Suite 3c, Topeka, Kansas. ADT offers to the public various items of hardware (such as internet-enabled wireless surveillance cameras) as well as software applications with which customers can view, record, and store footage via the internet through a connection to the ADT computer servers. The contents of videos, if stored, are sent online to ADT by electronic communication to the company and saved on ADT's computer systems for users. ADT allows users of its service to create accounts, associated with email addresses, to control access to a user's account for storing and viewing recorded video. ADT's application is available on various internet-enabled smartphones. ADT therefore satisfies the definition of a "remote computing service" under 18 U.S.C. § 2711(2) because it provides to the public computer storage or processing services by means of an electronic communications system.

5. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, this Court is "a district court of the United States (including a magistrate judge of such a court) . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

6.  Because of the services ADT provides, it is bound by the terms of the federal Stored

    Communications Act. The Stored Communications Act, 18 U.S.C. § 2701 et seq., controls

    the access of records, content, and other information from electronic communication service

    providers and remote computing service providers by governmental entities. 18 U.S.C. §

    2703(a) states, in part:

*A governmental entity may require the disclosure by a provider of electronic communication service of the contents of a wire or electronic communication, that is in electronic storage in an electronic communications system for one hundred and eighty days or less, only pursuant to a warrant issued using the procedures described in the Federal Rules of Criminal Procedure ...by a court of competent jurisdiction.*

7.  18 U.S.C. § 2703(b) states, in part:

*A governmental entity may require a provider of remote computing service to disclose the contents of any wire or electronic communication ... without required notice to the subscriber or customer, if the governmental entity obtains a warrant issued using the procedures described in the Federal Rules of Criminal Procedure ...by a court of competent jurisdiction.*

8.  18 U.S.C. § 2703(c) states, in part:

*A governmental entity may require a provider of electronic communication service or remote computing service to disclose a record or other information pertaining to a subscriber to or customer of such service (not including the contents of communications) only when the governmental entity ... obtains a warrant ... issued using the procedures described in the Federal Rules of Criminal Procedure ...by a court of competent jurisdiction.*

9.  Based on the foregoing facts, I believe that records and surveillance video kept by ADT for

    the account identified above may contain content, activity logs, personal identifiers, and

    other information that is relevant to this ongoing investigation, including but not limited to

    the following timeframe: between Friday, October 14, 2022 at 12:01 a.m. (CST) and

    Tuesday, October 18, 2022 at 11:59 p.m. (CST).  The relevant records and surveillance video

    includes:

    - **Subscriber Information:** Basic subscriber information for the above identified account
      consisting of account creation date(s), activation information, any and all email

address(es), telephone numbers, or other contact information associated with the
account(s);

- **Non-content:** Including but not limited to access logs, including deletion logs, showing
  dates and times the account has been accessed (or attempted to be accessed), metadata of
  such access or attempt (including IP addresses, device information, device name cookie
  information, etc.), timestamps and IP address(es) for the account logins/logouts, and any
  other accounts associated by cookie information stored in connection therewith; and

- **Content:** Any and all content data, including but not limited to video, audio, pictures,
  and communications (including any service communications with ADT, LLC).

10. 18 U.S.C. § 2703(g) does not require the presence of an officer for service or execution of

    search warrants issued under that chapter that are seeking the disclosure by a provider of

    electronic communications service or remote computing service of the contents of

    communications or records or other information pertaining to a subscriber to or customer of

    such service.


## FACTS ESTABLISHING PROBABLE CAUSE

11. The items to be seized constitute evidence and instrumentalities, in whatever form and

    however stored, relating to violations of 18 U.S.C. §§ 922(u), (i), and 2 (Burglary of a

    Licensed Firearms Dealer) (the "Target Offenses"). Based on the below facts, I have

    probable cause to believe a search of records held by ADT, LLC, ("ADT") will lead to

    evidence of the Target Offenses, as well as the identification of individuals who are engaged

    in the commission of these offenses.

12. On October 16, 2022, at approximately 12:40 a.m., the Basehor, Kansas Police Department

    responded to a possible commercial burglary at Free State Gun Company, LLC, located at

    14500 Parallel Road, Basehor, Kansas. Free State Gun Company, LLC, holds a federal

    firearms license (FFL). When officers arrived, they observed the front door of the business

destroyed, allowing officers to enter the structure.  When officers entered the building, they observed glass display cases broken and numerous firearms missing.

13. The business owners were alerted by an alarm system and responded to the store.  When the owners arrived, they were able to confirm numerous firearms were stolen.  After reviewing their inventory, the owners estimated approximately 50 firearms were missing to include rifles, shotguns, and pistols.

14. Surveillance cameras were installed within the business and turned over to law enforcement. The video from within the store revealed a white Ford F-150 backed up to the front of the business.  The door appeared to be destroyed from the truck.  At approximately 12:31 a.m., three individuals entered the business and were observed breaching another door leading the suspects into the main firearms display room.  Once inside the room, the three suspects broke the display glass and began carrying firearms from the building to the white Ford F-150.  All three suspects appeared to be wearing face coverings, head garments, sweatpants, and long sleeve hoodies.  Two of the suspects appeared to be tall and one may have been wearing a pair of glasses.  One of the three suspects wasn't wearing gloves and appeared to be a black male.  After approximately two minutes, the three suspects exited the front of the business and are believed to have fled eastbound on Parallel Road. On October 17, 2022, at approximately 5:00 a.m., deputies with the Johnson County, Kansas Sheriff's Office responded to an alarm or possible burglary at Up In Arms Kansas gun store located at 33490 Lexington Avenue, suite F, De Soto, Kansas.  Up In Arms Kansas holds an FFL.  When deputies arrived, they observed the front glass door of the business destroyed.  Deputies entered the gun store and observed glass display cases broken and numerous firearms missing.

5

15. The business owners were alerted and responded to the store. When the owners arrived, they were able to confirm numerous firearms were stolen. After reviewing their inventory, the owners estimated 25 pistols were stolen.

16. Surveillance cameras were installed on both the interior and exterior of the business. The owners of Up in Arms Kansas turned the video over to law enforcement. The exterior video showed a white Ford F-150 pull into the parking lot around 4:57 a.m. The truck pulled up to the front of the store and parked. The rear passenger exited the truck, walked up to the front door and looked through the door before running back to the truck.

17. The truck was then observed backing up to the front of the business and rammed the front glass door causing it to break. The driver and rear passenger exited the truck and entered the business. Once inside, the two suspects broke the glass display cases. The two suspects removed several handguns from the display cases and placed the firearms in the bed of the truck. Suspect 01 (Driver) appeared to be a tall thin male wearing a black hoodie, tan ball cap, face covering, light colored jeans, and white and red shoes.

18. Suspect 02 (Rear Passenger) appeared to be a tall thin male, wearing a black hoodie, face covering, light colored jeans and silver and black bottomed shoes.

19. Suspect 01 and suspect 02 began making trips back and forth from the store to the truck carrying firearms. On one occasion, suspect 01 ran back into the store and ran directly into the front of a metal cross beam on the front door that was still intact from the breach. Suspect 01 fell backwards but was able to maintain his balance and continued to retrieve firearms. ATF investigators believed the impact likely caused an injury to the face of Suspect 01. The tan hat from Suspect 01 fell off his head from the impact and landed on the ground inside the store. The tan hat was solid in color with an emblem on the lower corner

6

of front of the hat.  At one point, Suspect 01 tossed a pistol from the display case out the front door toward the back of the white Ford F-150. The firearm struck the back rear glass of the truck causing it to break.

20. While the theft of the firearms was taking place, a third suspect wearing a white Nike hoodie was observed on an exterior camera sitting in the front passenger seat of the white Ford F-150.

21. After approximately two minutes, Suspect 01 and Suspect 02 re-entered the white Ford F-150 and all three suspects fled the area. Exterior video captured the license plate of the white Ford F-150, it displayed 319 RCZ.  The registration returned to a 2003 Honda Pilot in Ottawa, Kansas.  The Johnson County Crime Lab responded to the scene and began processing evidence.  The tan hat that fell from Suspect 01 was photographed and collected on scene.

22. On October 17, 2022, ATF investigators responded to both scenes and began the investigation with local law enforcement.  After reviewing the video surveillance, ATF believed both FFL thefts were committed by the same suspects.  ATF Task Force Officer (TFO) Ryan Fincher and ATF TFO Jakob Blackman set up an alert system in hopes of tracking the white Ford F-150 by license plate readers (LPR's) across the Kansas City Metropolitan area.

23. LPR's are cameras set up in various intersections throughout the metropolitan areas allowing license plates to be captured via camera and saved in a database. This tool is often used by police to geographically track suspect vehicles.  The LPR alerts allow law enforcement to be notified when a certain license plate is captured by the camera.

24. On October 17, 2022, Merriam, Kansas Police Detective Kristin Jasinski learned of the FFL

burglaries and told members of law enforcement a possible suspect to consider was Benjamin

Custis. Detective Jasinski assisted in past theft investigations and knew Custis was involved

in a series of FFL burglaries in the past as a juvenile.

25. On October 18, 2022, TFO Blackman located a Facebook profile for Custis and began

looking through some pictures Custis had recently posted before the crimes. TFO Blackman

immediately recognized numerous photographs of Custis wearing and holding a tan hat. The

tan hat was solid in color with an emblem on the lower corner of front of the hat. The hat

appeared to be the same hat recovered from Up in Arms Kansas on October 17, 2022. In one

of the photographs posted October 12, 2022, a person wearing light-colored jeans is depicted

holding the tan hat while sitting inside a white vehicle. The photo only captured the lower

half of the person. The inside of the door panel was visible in the picture and appeared to be

the same as the inside driver door of a 2021 Ford F-150.

26.  ATF investigators believed Benjamin Custis was likely one of the three suspects involved in

the crimes.  On October 18, 2022, at approximately 12:53 p.m., TFO Blackman received an

LPR notification on Kansas plate 319 RCZ at N. 47th Street and Parallel Parkway in Kansas

City, Kansas. The notification indicated the truck was traveling eastbound on Parallel

Parkway. TFO Blackman began driving toward the area in an unmarked police vehicle. At

approximately 1:14 p.m., TFO Blackman observed a white Ford F-150 (hereinafter "the

truck") turn west on Parallel Parkway from N. 31st Street. TFO Blackman relayed the

information to ATF TFO Cole Massey and TFO Fincher. TFO Blackman followed the truck

covertly to the area of N. 38th and State Avenue, Kansas City, Kansas.

27. TFO Blackman observed the rear window of the truck was wrapped in plastic, which was

consistent with the rear window breaking on the white F-150 that was involved in the Up In

Arms Kansas burglary the day before. The truck pulled into the McDonald's drive-thru and begin to order food. Members of the KCKPD Special Operations Unit (SOU) attempted to contact the vehicle utilizing a marked patrol vehicle in front and behind the truck at the drive-through window. As police officers made contact, the truck reversed and struck a parked car before fleeing eastbound on State Avenue.

28. TFO Blackman began following the truck and relayed the information. A few minutes later, aerial surveillance was able to locate the truck around the 1300 block of State Avenue. ATF investigators began covertly following the truck as the truck traveled out of Kansas City, Kansas and into Kansas City, Missouri.

29. The truck was tracked via aerial surveillance to the 4500 block of East 75th Terrace, Kansas City, Missouri. Members of the Kansas City, Missouri Police Department Tactical Unit moved in and attempted to stop the truck. Officers were able to move in and apprehend three individuals. The driver was identified as Benjamin P. Custis, the front passenger was identified as Deldrick L. Bryant, and the rear passenger, who fled from the truck, was identified as Keisean Davis. Custis had visible scabs from an injury between his eyes and on his upper lip. I believe this injury was caused from Custis striking the cross beam at Up in Arms Kansas the day before.

30. Numerous firearms were observed in plain view on the rear passenger floorboard of the white Ford F-150. Members of ATF took photographs and collected the firearms in plain view. They included the following firearms:

- Glock, Model 48 .9MM pistol, with serial number BUKG086; Stolen from Up in Arms in De Soto, Kansas

- Glock, Model 19 9mm pistol, with serial number BWRN979; Stolen from Free State

9

Gun Company, Basehor, Kansas. An interstate nexus expert with the ATF
determined this firearm was not manufactured in Kansas and so necessarily traveled
in interstate commerce prior to arriving to Free State Gun Company.

- Free State Gun Company Model FS-15, multi-Caliber rifle with serial number 1005;
  Stolen from Free State Gun Company, Basehor, Kansas.

- Glock, unknown model, 9mm pistol, with serial number BUFW970; Stolen from Free
  State Gun Company.

31. Benjamin P. Custis was interviewed by TFO Blackman and TFO Fincher. Custis was read
his Miranda warnings and provided a statement. According to Custis, he purchased the truck
from a person a day ago in Kansas City, Missouri and he has never been to De Soto or
Basehor, Kansas. According to Custis, he was at his girlfriend's house in Osawatomie,
Kansas during the dates of the crimes and was not involved in the burglaries. Custis also
claimed he was homeless and did not know the other two individuals well and was only
giving them a ride. TFO Blackman asked Custis about his facial injuries and Custis claimed
his lip injury came from the police arrest and the scab between his eyes must have come from
him being drunk or "high."

32. Keisean Davis was interviewed by TFO Blackman and TFO Fincher. Davis was read his
Miranda warning and provided a statement. According to Davis, he was picked up by Custis
and Bryant earlier in the white Ford F-150 because he knew someone who could sell them
marijuana. Davis thought Bryant and Custis lived together at Bryant's house in Kansas City,
Kansas. Davis said he saw the guns in the truck and touched the firearms, but claimed the
firearms weren't his. Davis went on to say he was with his mother over the weekend, and
she could account for him being home. Davis ensured he had nothing to do with a gun store

burglary and has never been to Basehor, Kansas or De Soto, Kansas. TFO Blackman later spoke with Davis's mother who said Davis was home in the early morning hours of October 16th but was unsure as to his whereabouts on October 17.

33. Davis further stated that Deldrick Bryant texted him photographs of some firearms and Davis was planning on purchasing the camouflage rifle that was found in the truck, but never did. Davis said the messages would be in his phone.

34. Deldrick Bryant was interviewed by TFO Blackman and TFO Fincher. He was read his Miranda warning and invoked his right to remain silent.

35. Following the interviews, TFO Blackman, TFO Fincher and ATF Special Agent (SA) Clint Westgate responded to Deldrick L. Bryant's residence located at 6623 Wood, Kansas City, Kansas. Investigators contacted Bryant's grandmother, Alice Turner, who said Bryant did reside at the residence with her. Ms. Turner went on to say that Deldrick Bryant stays in the basement of her house and she has access to the basement. TFO Blackman explained the crime being investigated to Ms. Turner. Ms. Turner said she had seen the white truck at her house and knew Deldrick Bryant hung around the male who usually drove the truck. It was learned from other family members of Deldrick Bryant's that the male who drove the white truck goes by the moniker, "Lash." "Lash" is the known moniker of Benjamin P. Custis. Members of Bryant's family had seen Custis in the past and knew what he looked like. TFO Blackman was able to confirm with family that the person the family had seen at the house was Custis and Custis drove the white truck. Ms. Turner signed a consent to search form for the basement, the back yard, and a shed in the back yard of the address. Investigators located 12 pistols in the basement. All the pistols were stolen from Free State Gun Company or Up in Arms Kansas. ATF located two 5.56 rifles under the mattress of Deldrick Bryant's bed.

Both rifles were reported stolen from Free State Gun Company. ATF walked around the back yard of the address and observed a pair of camouflage gloves lying on the grass that appeared new. Bryant's family confirmed the gloves didn't belong to anyone in the residence. The gloves looked similar to what ATF observed being worn by Suspect #02 during the burglary at Free State Gun Company.

36. Following the recovery of evidence, investigators held a conversation with Alice Turner, Dajhane Turner (Alice Turner's daughter), and Delmajhne Bryant (Deldrick Bryant's sister) in the upstairs portion of the residence.

37. Alice Turner stated that she had not seen Deldrick Bryant with the guns. TFO Blackman told Ms. Turner that investigators received information that Benjamin Custis had been living with Deldrick Bryant in the basement. Alice Turner denied that Custis had been staying there and Delmajhne Bryant said Custis had been living out of his truck. TFO Blackman asked Alice Turner if Custis had been there often. Alice Turner said, "No" and Delmajhne Bryant said, "Yes." Delmajhne Bryant added that Custis had been staying there more in the past week. Alice Turner reiterated that Custis had not been staying in the residence. Delmajhne Bryant said Custis will stay outside the house and will occasionally come in to use the bathroom and go right back outside. Alice Turner stated that she didn't even know that and added that is why she put the lock on that downstairs door so she would know who is coming in the door by the notification she gets from the alarm company.

38. During the conversation, Delmajhne Bryant accessed the home surveillance video system provided by ADT on her cellular phone and was able to review video from the weekend of October 15, 2022.

39. TFO Blackman was watching surveillance video on Delmajhne Bryant's phone and asked if

they had the ability to share the videos by phone. SA Clint Westgate provided a business card with his phone number and email. TFO Blackman asked if there were videos of anyone else carrying firearms into the home as Delmajhne Bryant was searching through video.

40. Alice Turner asked if they did something early in the morning on Sunday morning and TFO Blackman said about 12:30 a.m. on Sunday. Alice Turner stated that Deldrick Bryant was not at home at that time. Alice Turner asked Dajhane Turner if the door was locked downstairs (referring to Sunday morning at 12:30 a.m.). Dajhane Turner said she had left and didn't have her keys, so she left the door open. As Delmajhne Bryant continued to watch the home surveillance video, Alice Turner was looking over her shoulder and commented, "You can't tell what kind of bag it is." The two continued watching videos and discussed what they were seeing. TFO Blackman asked for copies of any videos from their home surveillance from Saturday (October 15, 2022) on that showed the suspect truck (white F-150) in front of this house. Alice Turner stated that Deidrick Bryant knows what time she goes to work and what time she gets off and tries to avoid her.

41. Alice Turner reaffirmed that she last saw the suspect truck parked outside the house on Saturday (October 15, 2022). When she pulled in the driveway, the suspect truck drove away. Alice Turner identified the occupants as "Scooter" (Deldrick Bryant) and that boy (Benjamin Custis).

42. Delmajhne Bryant said the video shows Deldrick Bryant coming in at 6:00 p.m. on Sunday (October 16, 2022) but nothing in between. TFO Blackman asked if Deldrick Bryant knows where the surveillance cameras are located. Delmajhne Bryant said she did not think Deldrick Bryant knew there were cameras downstairs or in the upstairs living area.

43. TFO Blackman said the email might be the best way to send the video and that he did not

13

need every time Deldrick Bryant came in but wanted copies of video if he was carrying the purse (referring to the purse found it the downstairs closet containing multiple firearms) or long guns.

44. No surveillance videos were ever shared with investigators.

45. It is believed that ADT allows users to store copies of videos on servers under its control. Additionally, access logs may verify whether anyone accessed the account to delete any account data. Other information may verify ownership and/or account usage.

46. On Tuesday, October 25, 2022, Senior Intelligence Specialist, William Cotter faxed a preservation request to ADT for videos recorded by ADT systems associated with account holder Alice Turner, 6623 Wood Avenue for the period of time from Friday, October 14, 2022 at 12:01 a.m. (CST) through Tuesday, October 18, 2022 at 11:59 p.m. (CST).

47. Based on the foregoing, my training and experience, and the evidence gathered in the course of the investigation, I believe probable cause exists for a search warrant for the entirety of the ADT account associated with the identifiers listed above, for the specific categories of data listed, and for the specific time frame listed above. I therefore request a search warrant allowing investigators to obtain the video, information, and records sought from ADT in connection with that account.

I declare under penalty of perjury that the foregoing is true and correct.

Ryan Fincher
TFO Bureau of Alcohol, Tobacco, Firearms & Explosives

Sworn and attested by affiant via telephone, after being submitted to me by reliable electronic means on this ___14th___ day of December, 2022.

14

Honorable Teresa J. James
United States Magistrate Judge